SULLIVAN *v.* MODERN BROTHERHOOD OF AMERICA.

1  INSURANCE—ACCIDENT—DIRECTING VERDICT.

Testimony of plaintiff, who was insured against accidental injuries, that while she was washing clothing water splashed into her eye, and that gonorrheal infection, resulting in the loss of her eye ensued, was not so improbable, nor was the cause of her injury so conjectural, that the court should have directed a verdict for the insured.

2.  SAME—POLICY—DISEASE—WORDS AND PHRASES.

Nor was the loss of the eye the result of disease in such a sense that plaintiff could not recover.

3.  SAME.

Where the death or injury is caused by a disease not resulting from any bodily infirmity or disease existing at the time of the accident, but is itself caused by the external, violent, and accidental means which produced the injury, the disease is an effect of the accident, a mere link in the chain of causation, and the insurer is therefore liable.[1]

Error to Houghton; Streeter, J. Submitted November 6, 1911. (Docket No. 38.) Decided December 8, 1911.

Assumpsit by Mary E. Sullivan against the Modern Brotherhood of America upon a policy of insurance. Judgment for plaintiff. Defendant brings error. Affirmed.

*MacDonald & Kerr* (*Blythe, Markley, Rule & Smith,* of counsel), for appellant.

*Galbraith & McCormack,* for appellee.

STONE, J.  The defendant is a fraternal organization, having, among other features, a life and accident insur-

_____

[1]As to what constitutes an accident within meaning of accident insurance policy, see note in 30 L. R. A. 206.

ance for its members. It is organized under the laws of the State of Iowa, but has subordinate lodges in Michigan, where it is authorized to do business. Plaintiff became a member of what is known as Laurium Lodge, one of the subordinate lodges of the defendant in Houghton county, on the 11th day of September, 1907, and remained in good standing until after the time of the occurrence upon which this suit is based. On becoming a member of the order, plaintiff received a certificate or policy entitling her beneficiary to the sum of $1,000 in case of death, and, among other things, it provided that:

"One-fourth ($\frac{1}{4}$) the amount the beneficiary would be entitled to in case of death, will be paid to said member should she accidentally lose a hand, at or above the wrist, a foot at or above the ankle, or for the total permanent loss of the sight of an eye by accident."

The plaintiff by this suit claims the loss of the sight of the right eye by accident, and, under the provisions of the policy above quoted, she seeks to recover $250 therefor.

It was the claim of the plaintiff at the trial that on March 26, 1909, while doing her family washing, with a washtub and washboard, and while washing some flannels, some water from the tub was accidentally splashed into her right eye; that she rubbed her eye at the time; that it became and continued painful, and that it became much inflamed; that she called a physician, who found the eye badly inflamed, and he advised her that she consult a specialist. The specialist came and took charge of the case, and very soon sent the plaintiff to a hospital, where she remained between two and three weeks, and finally suffered the total loss of the eye. The physician diagnosed the case as inflammation of the mucous membrane of the eye caused by gonorrhea infection.

After proving her membership, about which there is no question, the plaintiff testified, in substance, that on the day named, between 10 and 11 o'clock in the morning, while she was washing, some of the suds got in her right eye; that at the time she was washing flannels, under-

wear; that she did not know how the suds got into her eye, it just splashed as she was washing; that she was not washing with a machine, but by a board; that, when the water splashed into her eye, it burned as soap would naturally do, and that she kept rubbing her eye; that shortly afterwards the eye pained her; that during the afternoon and evening her eye was quite sore, and that it pained worse the next day, which was Saturday; that she called a physician, Dr. Kerr, on Sunday morning. At that time her eye was inflamed. He advised her to get Dr. MacNaughton, an eye specialist. The next day she went to Dr. MacNaughton's office, and from there to the hospital, where she remained 18 days, and that she has no sight remaining in the right eye; and that she was then claiming the amount stated in the policy for the accidental loss of an eye.

Upon cross-examination she testified as follows:

"On Friday, March 26th, I was washing flannels which belonged to my own family. I had no outside washing. I never took in washing. To my knowledge there was no member of my family afflicted with gonorrhea at that time, nor has any member undergone treatment for gonorrhea since then. If any member of my family at that date had been afflicted with gonorrhea, I would have known it. I realized that there was something wrong with my eye shortly after the water splashed in it. It commenced to trouble me shortly after, and it pained me more and more. I consulted a physician Sunday morning. I did not consult a physician Saturday morning. Dr. Kerr was the first physician I consulted. At the time I did not know what was wrong with me. I knew it was my eye, but I did not know just what it was. I did not know just what would have caused it. Dr. Kerr did not tell me what was wrong with my eye. He just said it was quite bad, and advised me to see Dr. MacNaughton. Dr. MacNaughton saw me the same day about 2 o'clock. He never told me what was the matter with my eye. He always said it was a bad eye every time I asked him, and the fourth day I was in the hospital he told me the sight was practically gone. I never found out that I had

gonorrhea of the eye until it was brought up here the other day.

"*Q.* I want to find out when you found out first that you had gonorrhea of the eye?

"*A.* I never found out until it was brought up here the other day. I never heard about it until the other day because Dr. MacNaughton never told me anything of that.

"*Q.* Didn't you sign a sworn statement that you presented to the company stating that you had gonorrhea of the eye?

"*A.* No, sir; I did not.

"*Q.* You just testified to that.

"*A.* I stated I had lost sight of the eye, but not of such a thing.

"*Q.* Then you never knew this until a short time ago, that you had gonorrhea of the eye?

"*A.* No, sir; I didn't. That's about all I done that day, except I went out in the afternoon a few blocks from home to Ryckman & Minnear's store. I did not do any other housework that day except getting supper. Nothing else that I know of got in my eye that day. I did not do any sweeping on that day. I did the day before. Nothing got in my eye then.

"*Q.* Where did this gonorrhea come from that infected your eye?

"*A.* I couldn't say.

"*Q.* If there was no one in your family infected with gonorrhea, where would it come from?

"*A.* I don't know. I couldn't say. I am positive that the injury I received was received by water splashing in my eye. I remember distinctly. I put washing liquid in the water. I am positive of that. I am positive that the injury occurred Friday, March 26th. I swear to that positively. I am just as positive that it occurred on March 26th as that it occurred to me. The statement of proof of claim that I made to the Modern Brotherhood of America was correct in all its parts and statements."

Dr. M. M. Kerr, a witness produced and sworn on behalf of the plaintiff, testified as follows:

"My name is M. M. Kerr. I am a regular practicing physician in Laurium, and I have been a physician about 11 years. I was called to treat professionally Mary E. Sullivan, the lady who was just on the witness stand, the latter part of March, 1909. I don't remember the day of

the month. It was on Sunday morning about 7 or 8 o'clock. I found the eye in a condition that we know as hyperemia, a highly inflamed condition of the surface of the eye. I diagnosed the case from a clinical standpoint. I thought I knew what the trouble was. It appeared to me to be a case of gonorrheal ophthalmia or an inflammation due to gonorrhea. I didn't give it any treatment. It seemed too severe for me, and I thought it would be better for a specialist to examine her. I called a specialist over Mrs. Sullivan's telephone. I had nothing further to do with the case except seeing it on one or two other occasions at the hospital. I did not at any time tell Mrs. Sullivan that she was suffering from gonorrheal infection of the eye."

Cross-examination by Mr. Kerr:

"I could not tell definitely how long the eye had been suffering from the injury when I examined it, possibly 48 hours, possibly longer. Gonorrhea of the eye could not be contracted unless there were gonorrheal germs in the washing water, but the germs would have to be somewhere and brought in contact before the disease could be contracted. Mrs. Sullivan told me that she injured her eye while washing clothing a couple of days before, and that the water in the tub came in contact with her eye, either from splashing or rubbing her hand over the eye. I treated Mrs. Sullivan once before about 8 or 10 years ago. I never treated her for gonorrhea."

The foregoing constitutes all the evidence in the case.

The defendant moved the court to direct a verdict in its favor, for the reason that the injury alleged was a disease, and not an accident, that the plaintiff had failed to establish a case, and that the plaintiff had failed to establish by professional testimony the loss of the sight of the eye. The motion was overruled and the defendant excepted.

The court charged the jury, in substance, as follows:

"The plaintiff having brought this action into court, the burden of proving the case rests upon her, and she is obliged to satisfy you by a fair preponderance of the testimony that she has suffered the loss of an eye by accident. The particular allegation on which the plaintiff rests is

that she became afflicted with a disease through an accident which happened at the time that she was doing washing in her own house. Now, the plaintiff must prove by a preponderance of the evidence the fact alleged, that the plaintiff contracted a gonorrheal infection of the right eye while doing the family washing on the date alleged. Unless you believe from the evidence that the plaintiff contracted the gonorrheal infection of the eye by the splashing of the water from the washtub in the eye, you should find for the defendant.

" If you believe the probabilities are as great that the plaintiff received the gonorrheal infection in the eye, as her hand came out of the water in a wet condition, and that she rubbed her eye in the wet condition, then you should find for the defendant. If you believe from the evidence that she contracted the infection by having the germs transmitted to her by an outside agency, such as being transmitted through the air, or coming from any other person infected with such disease, then you should find for the defendant. The question is solely for you, gentlemen, to determine that one question from a fair consideration of this testimony. If you are convinced that the water splashed in the eye, and the infection was received in that way, taking into consideration the circumstances which immediately followed, and the development of the disease as testified to by the plaintiff, you would be justified in finding a verdict for her. If she has not sustained that by a fair preponderance of the evidence, find for the defendant."

The jury returned a verdict for the plaintiff for $260.40, and a judgment for the plaintiff was entered.

There was no motion for a new trial, and the defendant has brought the case here for review. There are a number of assignments of error.

In their brief and argument defendant's counsel have presented two propositions that may be said to be covered by the assignments of error:

"*First.* The plaintiff's theory, that plaintiff received a gonorrheal infection of the eye by reason of the splashing of the water therein from the washtub during her ordinary occupation of washing clothes for the family, was based wholly upon improbable circumstances, and that there is

no proof of such fact, and consequently no question for the jury.

"*Second.* That, even admitting the infection of the eye to have been caused by the splashing of water, such infection and accompanying injury to the eye should properly be classed as the effect of disease, and not by accident within the meaning of the clause of the policy under which plaintiff claims indemnity.

1. Referring to the first proposition of counsel, can it be said, as claimed, that the facts in evidence are as consistent with the theory of the defendant as with the claim of the plaintiff? We should not lose sight of the facts that the defendant offered no evidence, and that no motion for a new trial, claiming that the verdict was contrary to the evidence, was made. The testimony on the part of the plaintiff stands alone. It is to the effect that water was accidentally splashed from the tub in which plaintiff was washing flannel clothing into her eye, that her eye became inflamed immediately thereafter, and that as a result of such inflammation she lost the sight of the eye. Can we say as matter of law that this testimony was so improbable, or that the presence of the germ in the water was so improbable or conjectural, that the case should not have been submitted to the jury? We think not. The evidence of the physician was to the effect that the sight of the eye was destroyed by inflammation due to gonorrhea; that gonorrhea of the eye could not be contracted unless there were gonorrheal germs brought in contact with it, and the splashing of the water as testified to by the plaintiff was the only explanation given. We cannot say that the testimony was inconsistent with the theory that the injury was accidental. Nor can we hold that the court should have determined that the germ came into the eye in some way other than as claimed by the plaintiff. *Furbush* v. *Casualty Co.*, 131 Mich. 234 (91 N. W. 135, 100 Am. St. Rep. 605); *Grimme* v. *Fraternal Aid Ass'n, ante,* 240 (132 N. W. 497). By the testimony of the physician the cause of the trouble is shown, to wit, the

presence of the germ in the eye, and the manner in which this germ was introduced is rendered probable by the testimony of the plaintiff.   We think that the case was one for the jury, and that the defendant cannot justly complain of the charge.

2. In support of defendant's second proposition counsel cite the following cases: *Fidelity & Casualty Co.* v. *Stacey's Executors,* 143 Fed. 271, 74 C. C. A. 409 (5 L. R. A. [N. S.] 657); *Bacon* v. *Accident Ass'n,* 123 N. Y. 304 (25 N. E. 399, 9 L. R. A. 617, 20 Am. St. Rep. 748); *Dozier* v. *Casualty Co.* (C. C.), 46 Fed. 446 (13 L. R. A. 114); *Feder* v. *Traveling Men's Ass'n,* 107 Iowa, 538 (78 N. W. 252, 43 L. R. A. 693, 70 Am. St. Rep. 212). The case of *Fidelity & Casualty Co.* v. *Stacey's Executors, supra,* was decided in the circuit court of appeals, fourth circuit.   There the holder of a policy insuring him against disability or death "resulting directly, and independently of all other causes, from bodily injuries sustained through external, violent and accidental means," committed an assault and battery on a person who made no resistance, injured his hand, and, in striking such person in the face, injured his hand, and a few days later died from the effects of blood poisoning which developed in the wound.   It was held that such injury was not "accidental" within the meaning of the policy, and that plaintiffs could not recover.   It clearly appeared there that the injury, which was the direct means causing the death, was the natural result of a voluntary act committed when Stacey was in full possession of his mental faculties.   Pritchard, C. J., the writer of the opinion, said:

"The immediate cause of the insured's death was disease, to wit, blood poisoning.   The company did not undertake to insure against blood poisoning or any other disease.   But the fact that it had not insured against disease would not be a good defense in this case, if it * * * was the direct result of accidental means.   * * *   Unless it could be shown that the original cause to which the disease can be traced was 'accidental means,' then the dis-

ease from which the insured died would be a subject against which the company did not insure."

We think that the case is readily distinguished from the instant case. In *Bacon* v. *Accident Ass'n, supra,* the court was divided, two judges dissenting. The majority opinion distinctly holds that the deceased died from the disease within the meaning of the language used in the policy sued upon, and not from an accident causing the disease. It did not appear how the animal virus (the cause of the malady known as malignant pustule) came in contact with the body of the deceased. In the majority opinion the court distinctly adheres to its former opinion in *Paul* v. *Insurance Co.,* 112 N. Y. 472 (20 N. E. 347, 3 L. R. A. 443, 8 Am. St. Rep. 758), where the deceased came to his death by accidentally inhaling illuminating gas, and where the plaintiff recovered. We think that the *Bacon Case* is not applicable in the instant case. In *Dozier* v. *Casualty Co., supra,* it was held that "sunstroke or heat prostration" contracted by the decedent in the course of his ordinary duty as a supervising architect was a disease, and did not come within the terms of a policy of insurance against bodily injuries, sustained through external, violent, and accidental means, but expressly excepting "any disease or bodily infirmity." The case of *Sinclair* v. *Assurance Co.,* 3 El. & El. 478, is cited with approval. We do not think that these sunstroke cases are in point.

We have also examined the case of *Feder* v. *Traveling Men's Ass'n, supra,* where it was held that death of the insured will not be held accidental merely because it results from the rupture of an artery, as he reaches to close a window, it not appearing that anything was done or occurred which he had not foreseen and planned, except the rupture. The court said:

"The evidence shows that the cause was the ruptured artery; but that was not accidental if it was the natural result of an act voluntarily done by Feder. That he did anything but what he intended to do in attempting to close

the shutters is not shown nor claimed. It is not even shown that he made any unusual exertion in what he did. Had the artery been ruptured while decedent was sitting quietly in his chair, or while walking at a moderate pace, there would be no ground for claiming that the rupture was accidental."

While we cannot undertake to reconcile all of the authorities upon this subject, it seems to us that the case last cited differs materially in principle from the instant case. We are of opinion that the position and claim of the plaintiff find support in the case of *Western Commercial Traveler's Ass'n* v. *Smith,* 85 Fed. 401, 29 C. C. A. 223 (56 U. S. App. 393, 40 L. R. A. 653). This case was in the United States circuit court of appeals, eighth circuit. The opinion was written by Sanborn, C. J. It was there held that an abrasion of the skin of a toe, unexpectedly caused without design, by unforeseen, unusual, and unexpected friction in the act of wearing a new shoe, is an accidental injury within the meaning of an insurance policy; and that blood poisoning caused by an accident, and which is a mere link in the chain of causation between the accident and the death which it produces, is not an intervening and independent cause of death which will prevent liability on insurance against accident. This is a well-reasoned opinion, and many cases are cited. We quote the following language appropriate in the instant case:

" If the death was caused by bodily injuries effected by external, violent, and accidental means alone, the association was liable to pay the promised indemnity. If the death was caused by a disease which was not the result of any bodily infirmity or disease in existence at the time of the accident, but which was itself caused by the external, violent, and accidental means which produced the bodily injury, the association was equally liable to pay the indemnity. In such a case the disease is an effect of the accident, the incidental means produced and used by the original moving cause to bring about its fatal effect, a mere link in the chain of causation between the accident and the death, and the death is attributable not to the disease, but to the *causa causans,* to the accident alone.

*Traveler's Ins. Co.* v. *Robbins,* 27 U. S. App. 547, 560, 65 Fed. 178, 185, 12 C. C. A. 544, 27 L. R. A. 629; *Union Pacific R. Co.* v. *Callaghan,* 12 U. S. App. 541, 550, 56 Fed. 988, 994, 6 C. C. A. 205, 210; *Milwaukee, etc., R. Co.* v. *Kellogg,* 94 U. S. 469, 475; *National Masonic Accident Ass'n* v. *Shryock,* 36 U. S. App. 658, 73 Fed. 774, 20 C. C. A. 3–5."

In the following cases it was held that there was liability: In *Hamlyn* v. *Insurance Co.,* 1 Q. B. Div. 750, a person sustained an injury to his knee in attempting to catch a rolling marble, it being found that the injury resulted from an unnatural position or movement of the leg, which was not intended by the person injured. In *North American, etc., Ins. Co.* v. *Burroughs,* 69 Pa. 43 (8 Am. Rep. 212), the injury was caused by the unintended slipping of a pitchfork in the hands of the person injured, in such a manner that it struck him in the bowels, causing peritonitis. In 4 Cooley's Briefs on the Law of Insurance, p. 3159, there is a collection of cases in which the causes of injury or death have been held to be accidental: Asphyxiation by gas in well. *Pickett* v. *Insurance Co.,* 144 Pa. 79 (22 Atl. 871, 13 L. R. A. 661, 27 Am. St. Rep. 618). Blood poisoning resulting from cutting a corn. *Nax* v. *Insurance Co.* (C. C.), 130 Fed. 985. Blood poisoning from use of hypodermic needle. *Bailey* v. *Casualty Co.,* 8 App. Div. (N. Y.) 127 (40 N. Y. Supp. 513), affirmed without opinion, 158 N. Y. 723 (53 N. E. 1123). Poisoning by sting of insect. *Omberg* v. *Accident Ass'n,* 101 Ky. 303 (40 S. W. 909, 72 Am. St. Rep. 413). Poison taken by mistake. *Mutual Accident Ass'n* v. *Tuggle,* 39 Ill. App. 509; *Hill* v. *Insurance Co.,* 22 Hun (N. Y.), 187; *Pollock* v. *Accident Ass'n,* 102 Pa. 230 (48 Am. Rep. 204). See, also, upon the general subject the following authorities: *Fidelity & Casualty Co.* v. *Johnson,* 72 Miss. 333 (17 South. 2, 30 L. R. A. 206); *Equitable Accident Ins. Co.* v. *Osborn,* 90 Ala. 201 (9 South. 869, 13 L. R. A. 267); 1 Cyc. pp. 249–251, and cases cited; Richard on Insurance Law,

§§ 385, 386; Niblack on Accident Insurance, § 376 *et seq.* See note to *White* v. *Standard Life, etc., Ins. Co.,* 5 Am. & Eng. Ann. Cas. 87. See, also, note to the English case of *Brintons* v. *Turvey,* 2 Am. & Eng. Ann. Cas. 140, 141.

We find no prejudicial error in the record, and the judgment of the circuit court is affirmed.

OSTRANDER, C. J., and STEERE, MOORE, and BROOKE, JJ., concurred.